**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Matthew Pound, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number 720-855-0485, ("the TARGET NUMBER"), that is stored at premises controlled by Cellco Partnership dba:Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey, 07921. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Cellco Partnership dba:Verizon Wireless to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2. Your affiant is a full-time salaried law enforcement officer for the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and has been so since May 25, 2014. Your affiant routinely investigates violations of federal criminal statutes, to include violations of federal firearms and narcotics laws. Your affiant has specifically investigated violations related to subjects who are found to be in possession of illegal and altered firearms. Prior to being a Special Agent with ATF, your affiant was a full-time salaried law enforcement officer for the Albuquerque Police Department for approximately 9 years. While at the Albuquerque Police Department, your affiant assisted in the apprehension

and investigation of individuals involved in serious violent crime to include Homicide, Kidnapping, Aggravated Battery and Assaults, Narcotics Trafficking, Firearm Trafficking and Prohibited Persons in Possession of Firearms.  While employed by the Albuquerque Police Department, your affiant was assigned to the ATF as a Task Force Officer for approximately five (5) years.  Your affiant has been involved in the investigation of more than 200 cases involving Federal Firearms and/or Narcotics violations, and has written and/or participated in the execution of over 100 federal and state search warrants involving violent crime, organized crime, illegal firearms possession, and the use and trafficking of narcotics and armed narcotics trafficking.

   3. Your Affiant has personally participated in the investigation of the offenses discussed below.  The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from federal and local law enforcement officers, and information obtained from review of evidence and analyses of reports.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

   4. Based upon the facts set forth in this affidavit, I submit that there is probable cause to believe that the records and other information described in Attachment A and Attachment B will help provide evidence to law enforcement to which may assist or provide leads in the ongoing investigation for the events described below, and to determine the nature and scope of their activities which were committed in violation of Title 21, United States Code, Section 841: Distribution and possession with intent to distribute a controlled substance; Title 21 United States Code, Section 856: Knowingly maintain any place, whether permanently or temporarily, for the purpose of distributing or using any controlled substance; Title 18, United States Code, Section 2: Aiding and Abetting.  Based on the information detailed below, there is

probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

## PROBABLE CAUSE

5. On March 6, 2019, Aurora Police Department (APD) Narcotics Detectives were conducting surveillance near a motel establishment identified as the "Summit View Inn" located at 11800 E. Colfax Ave. APD Narcotics Unit had also recently executed narcotics related search warrants at the Summit View Inn on three (3) separate motel rooms, specifically rooms #308, #321 and #323. When executed, the search warrants yielded amounts of suspected cocaine.

6. While conducting surveillance, APD detectives observed a male, later identified as Timothy SPIKES, enter the parking lot driving a white Dodge Charger with Colorado Temporary License Plate 723380. Detectives watched SPIKES meet with an unknown black male, then walk directly to and enter motel room #205.

7. While SPIKES was in room #205, detectives observed a significant increase in pedestrian foot traffic entering and exiting motel room #205. Detectives observed approximately thirteen (13) to fifteen (15) people enter room #205 during a twenty (20) minute time span. Detectives noted that when the unknown subjects would enter room #205, these unknown subjects would stay in the room for approximately thirty (30) seconds to one (1) minute, then exit. Through training and experience, the detectives know that such activity is indicative of illegal narcotic sales and/or distribution from within room #205.

8. SPIKES left the motel room approximately twenty minutes after arriving, leaving the parking lot in the same Dodge Charger he arrived in. APD Detectives followed SPIKES until a traffic stop was conducted because the Dodge Charger had illegal tint on the windows of the vehicle. Detectives noted that the vehicle registered to a female subject, Sylvia MONTOYA,

with an address listed as 2564 South Yates St., Denver, CO. During the traffic stop, a K9 trained to detect the presence of the odor of narcotics indicated that the odor of narcotics was present in the Dodge Charger. Therefore, the Dodge Charger was towed to a secure holding facility to be held for the execution of a search warrant.

9. On March 12, 2019, APD Detectives executed a State of Colorado search warrant on the Dodge Charger and seized a Springfield Armory, model XD-45 Tactical, .45 caliber semiautomatic pistol with serial number US684774 from the glove compartment of the vehicle. This firearm was queried through the National Crime Information Center (NCIC) and found to be reported as stolen out of Aurora, CO in 2017. APD Detectives also located and seized 6.1 grams of crack cocaine and 12.7 grams of methamphetamine in the same glove compartment as well as a red and black digital scale that contained a white colored residual substance on the faceplate of the scale.

10. Based on the items seized in the execution of the Search Warrant, APD Detectives obtained an arrest warrant for SPIKES.

11. On March 28, 2019, detectives from the Denver Police Department (DPD) District 6 Narcotics Unit, along with APD narcotics detectives, conducted a joint operation to arrest SPIKES on the felony arrest warrant obtained by APD Detectives. Officers, through investigation, learned SPIKES could be located at 3966 S. Wadsworth Blvd.

12. DPD and APD detectives observed SPIKES and MONTOYA leave the residence located at 3966 S. Wadsworth Blvd in a black Dodge Challenger with Colorado License Plate DSO 303, which listed to SPIKES and MONTOYA. Surveillance was conducted on SPIKES and MONTOYA until a traffic stop could be conducted.

13. Once stopped, SPIKES was placed under arrest for the outstanding warrant. During the search incident to arrest of SPIKES, officers $3,150.00 in United States currency on SPIKES' person, three (3) cellular telephones, an Apple watch and keys to apartment #201 located at 3966 S. Wadsworth Blvd.

14. MONTOYA asked why SPIKES was being arrested and was asked to exit the vehicle. A narcotics K9 was involved in the operation and was called to the traffic stop. DPD K9 "Koda" was deployed on the Dodge Challenger. K9 "Koda" jumped through the driver's side window on his own and gave an indication of the presence of a narcotics odor in the front passenger area. When "Koda" was deployed and gave an indication of a narcotic odor, MONTOYA continually stated to officers on scene "You can't do that! That's illegal." DPD Detective Akens continued to deploy "Koda" on the exterior of the vehicle. "Koda" indicated on the rear of the trunk. Officers searched the vehicle and located $3,000.00 in United States currency and empty clear baggies in the center console.

15. All of the currency (amount recovered from SPIKES person and the amount recovered from the center console) were placed into two separate envelopes and placed on the ground along with four (4) other empty envelopes. "Koda" was deployed on the envelopes and gave an indication to the presence of a narcotic odor on both envelopes which contained the currency.

16. While on scene, APD detectives spoke to MONTOYA about MONTOYA's relationship with SPIKES. MONTOYA denied having an intimate relationship with SPIKES and stated that SPIKES is a family friend. MONTOYA told APD Detectives that MONTOYA did not know what was going on and that the male she was with is named "Lucky," then identified him as SPIKES. MONTOYA told APD Detectives that MONTOYA lives in Denver

and knew SPIKES dad back in the day. MONTOYA said that SPIKES is just a family friend and stated "I don't deal with his stuff, I don't know what he does, but we were just looking at furniture." MONTOYA then stated "I don't know what his business is. I don't deal with his business, he's a friend. If you ask a lot of questions, you can call the attorney we have listed." Investigators asked MONTOYA if MONTOYA and SPIKES lived together to which MONTOYA replied "No, he has a girlfriend he deals with. Do you guys have a thing to search my car? Do you guys have a warrant to search my car?" MONTOYA told APD detectives that MONTOYA did not know where SPIKES lived and that MONTOYA "didn't go to his house like that." APD detectives noted once the interview was concluded that MONTOYA was being untruthful with detectives during the duration of the interview.

17. MONTOYA was subsequently allowed to leave the traffic stop and left the area on foot while SPIKES was transported from the scene to the DPD District 6 Police Station. Prior to leaving the scene, MONTOYA asked DPD officers for MONTOYA's belonging out of the vehicle. MONTOYA was told that all items inside the vehicle were going to remain inside the vehicle due to the vehicle being impounded and held as evidence. MONTOYA asked several times for MONTOYA's house key and stated it was MONTOYA's only one. MONTOYA was not provided with the requested house key.

18. While transporting SPIKES to DPD District 6, SPIKES was observed continually shuffling his hands behind his back and re-adjusting his seating position. Once at the DPD District 6 Station, officers observed that as SPIKES exited the squad car, his underwear was pulled down. At that point, DPD Narcotics Sgt. Foster authorized a strip search for SPIKES.

19. SPIKES immediately became noncompliant and stated that SPIKES would not comply with the strip search. SPIKES was told by Officers that the search had been authorized

and that SPIKES needed to comply. SPIKES complied with taking off his shoes and socks, as well as his sweatshirt. SPIKES then pulled down the front of his pants, exposing his genitalia, before pulling his pants up, stating that he was not going to comply any further.

20.     SPIKES was subsequently placed in handcuffs so the strip search could be completed. Upon removing SPIKES' pants, officers could plainly see a piece of clear plastic secreted in between his buttocks. Officers removed the item and found it to be a clear plastic baggie which contained suspected black tar heroin.

21.     While at the District Six Station, SPIKES was brought into an interview room and requested to call MONTOYA. The call was made on speaker and SPIKES asked MONTOYA if SPIKES should give up his "connects?" Your affiant knows from training and experience that "connects" is a common term for a drug source of supply. MONTOYA replied to SPIKES, "do whatever you need to do." SPIKES told MONTOYA that he did not want anything to happen to MONTOYA and again MONTOYA responded for SPIKES to do whatever he needed to do. MONTOYA then told SPIKES "the police are at your apartment, I can't get in. I don't know how they found your apartment."

22.     Later, DPD District 6 Narcotics Detectives obtained a state search warrant for 3966 S. Wadsworth Blvd Apartment #201. Prior to the execution of the warrant, a maintenance repair man arrived at the apartment and said that there had been a request made to change the locks. Investigators on scene were told that the tenant from Apartment #201 had gone into the leasing office requesting a lock change because the tenant had lost her keys. Detectives confirmed with him that the tenant who made the request was MONTOYA. It was subsequently learned by investigators that MONTOYA had immediately returned to the apartment complex

after being released from the traffic stop.  MONTOYA immediately went to the leasing office and requested the locks on the apartment to be changed.

23. The search warrant was executed at apartment #201 and the following items were recovered and seized:

- A W2 form belonging to MONTOYA
- Crack Cocaine
- Heroin
- Methamphetamine
- Four (4) digital scales
- Miscellaneous Paperwork
- Drug paraphernalia
- Red Backpack (which contained suspected Methamphetamine)
- United States Currency ($1,342.00)
- Dinner plate which contained suspected cocaine residue

24. Presumptive screening results from the DPD forensic unit showed the following:

- 103.956 grams of crack Cocaine which tested positive for the presence of cocaine
- 9.314 grams of Heroin which tested positive for Heroin
- 27.925 grams of Methamphetamine which tested positive for Methamphetamine

25. Your affiant received recorded calls from the Denver Sheriff's Department after SPIKES was booked into Denver City Jail.  Between March 29, 2019 and April 3, 2019, SPIKES called the TARGET NUMBER and spoke to MONTOYA.  Your affiant knows the female to be MONTOYA based on their conversation and the intimate knowledge of the events of March 6 and 28, 2019 that MONTOYA discussed with SPIKES during the calls.

26. Upon further investigation, your affiant learned that TARGET NUMBER is a Verizon Wireless telephone number registered to Posh Yarn Boutique located at 2627 S. Depew Pl. Lakewood, CO.  A search of Posh Yarn Boutique through the Colorado Secretary of State

website shows MONTOYA as registering the trade name "Posh A Yarn Boutique" located at 2627 S. Depew Pl., Lakewood CO.

27. A search of law enforcement databases also shows MONTOYA to list the TARGET NUMBER as being MONTOYA's telephone number.

28. Based on your Affiant's training and experience, your Affiant knows that a person who is involved in criminal activity will often try to distance or separate their involvement in the criminal activity as well as minimize their knowledge as co-conspirators or of co-conspirators actions or crimes while talking to Law Enforcement Officers.

29. Based on your affiant's training and experience, your affiant knows that a person who is involved in criminal activity often uses electronic devices, including but not limited to wireless telephones, to aid in their criminal activities. Your affiant knows, based on his training and experience, suspects frequently communicate with each other prior to, during and/or after the commission of a crime, and frequently utilize cellular phones during the commission of a crime. The information obtained from this cellphone usage can be of significant assistance to the investigation and evidence in a subsequent criminal prosecution by showing the communication records/pattern(s) between any possible suspect and co-conspirators. Location information and call detail records generated by the use of cellphones can indicate the general geographic area that the mobile device was located at, as well as provide investigative leads of whether witnesses or suspects communicated with anyone prior to, during and/or after a criminal event, which can associate the cellular phone/device to a specific suspect or individual.

30. Based on your affiant's training and experience, your affiant knows that acquiring an extended period of call detail records can assist in establishing a pattern of life, or use, of a target telephone. Longer period of records outside the immediate date/time frame of the

underlying crime can assist investigators in establishing calling patterns of the TARGET NUMBER and prevalent cell sectors utilized by TARGET NUMBER. The establishment of this pattern of life, or use, is critical in helping investigators determine if, and when, this calling pattern changes, intensifies, or wanes during relevant time periods within the investigation. These changes in the pattern of life can also assist investigators in identifying any co-conspirator(s) who may have provided aid or counsel during the relevant time period surrounding the conception, planning, commission and/or cover-up of the criminal activity.

31. Based on your affiant's training and experience, your affiant knows that historical cell-site records identify the cellular tower that a target phone used when engaging in a communication such as a call or text. Many cellular towers have multiple antenna faces, or "sectors," each of which provides service to a particular portion of the tower's geographic service area. In such cases, the historical cell-site records will also identify the sector of the cell tower that the phone used during the communication. Investigators can use this information about the cell tower and sector that were used by a phone to determine the general area in which the target phone was likely to be at the time that a particular communication occurred. While the precision of this information varies depending on factors including the distance between cellular towers, at best, cell-site location information will reveal the neighborhood in which a phone was likely to have been located.

32. Based on your affiant's training and experience, your affiant knows that certain events like phone calls, text messages, or data applications updating can cause the Service Provider to initiate a signal on their network to establish the location of a device. This location data is then stored by the Service Provider, such as Cellco Partnership dba:Verizon Wireless. Such information as date, time, latitude, longitude, cell sites, and accuracy of the location data

are stored and can be provided to law enforcement. Not every call, text message, or data application update causes his data to be created and stored. Therefore, there is no way to know what exact information the Service Provider has until it is reviewed. This data can be helpful to investigators when trying to locate the user of a given cellular device and/or to establish a pattern of life for the user of the given cellular device.

33. The requested call detail records are evidence that will serve to potentially identify investigative leads and avenues forward, prove or disprove known and future investigative conclusions, and/or corroborate or disprove or discredit (as applicable) witness and/or suspect statements. Investigators want to learn if the cell site data for the user of Cellco Partnership dba:Verizon Wireless phone number 720-855-0485 (TARGET NUMBER) show that the device accessed cell sites in the area of the crimes during the relevant time frames, including the apartment at 3966 S. Wadsworth Blvd. This will be a significant piece of information that will help investigators to know whether or not the user of the TARGET NUMBER should be considered as a suspect in this investigation. Furthermore, the date range of February 1, 2019 through April 30, 2019 is requested in order to establish the pattern of life described in paragraph 30, above. Your affiant believes MONTOYA and SPIKES were engaged in drug trafficking prior to March 6, 2019, given the observations of law enforcement and the quantities of narcotics seized from the apartment at 3966 S. Wadsworth Blvd. Your affiant is actively attempting to obtain how long MONTOYA and SPIKES have been connected to 3966 S. Wadsworth Blvd, as your affiant believes they maintained that location in order to distribute narcotics. The information detailed in Attachment B, from TARGET NUMBER, will help law enforcement understand their connection to this location, as well as other locations that could be stash houses or locations for sources of supply of narcotics. Given MONTOYA's statements to law

enforcement regarding her affiliation with SPIKES, this information will help corroborate or disprove her statements by showing her connection, if any, to 3966 S. Wadsworth Blvd.  The end date of April 30, 2019 was chosen based on SPIKES' release from custody and because your affiant is unsure of the status of the lease at 3966 S. Wadsworth Blvd after March 28, 2019.  The requested information would clarify if SPIKES and/or MONTOYA continue to associate with this location.

34.     Based on your affiant's training and experience, I have learned that Cellco Partnership dba:Verizon Wireless is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records."  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

35.     Based on my training and experience, I know that Cellco Partnership dba:Verizon Wireless can collect cell-site data about the TARGET NUMBER.  I also know that wireless providers such as Cellco Partnership dba:Verizon Wireless typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of

business in order to use this information for various business-related purposes. Based on my training and experience, I know that wireless providers such as Cellco Partnership dba:Verizon Wireless typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Cellco Partnership dba:Verizon Wireless typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the TARGET NUMBER's user or users and may assist in the identification of co-conspirators.

## **AUTHORIZATION REQUEST**

36. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

37. I further request that the Court direct Cellco Partnership dba:Verizon Wireless to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. Because the warrant will be served on Cellco Partnership dba:Verizon Wireless, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

38. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be restricted until further order of the Court. These

documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to restrict these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

                                      Respectfully submitted,

                                      *s/Matthew Pound*
                                      Matthew Pound
                                      Special Agent
                                      ATF

Sworn to and subscribed before me this __22d__ day of May, 2019.

                                      _____
                                      THE HON. NINA Y. WANG
                                      UNITED STATES MAGISTRATE JUDGE

**This Affidavit was reviewed and submitted by Celeste Rangel, Assistant United States Attorney.**